UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SCOTT GUSTAFSON, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 4:18-cv-02074 SRC |
| ) | |
| BI-STATE DEVELOPMENT ) | |
| AGENCY OF THE MISSOURI- ) | |
| ILLINOIS METROPOLITAN ) | |
| DISTRICT, ) | |
| ) | |
| Defendant(s). ) | |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on Bi-State Development Agency's Motion to Exclude Testimony of David R. Rishel and Dr. Joel Telles Pursuant to Daubert [79].

**I.    BACKGROUND**

In his Fourth Amended Complaint, Plaintiff Scott Gustafson alleges two claims against Defendant Bi-State Development Agency of the Missouri-Illinois Metropolitan District ("Bi-State"): denial of access to governmental services, programs, and activities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*. ("ADA"), and failure to provide accommodations and access to information in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Specifically, Gustafason alleges Bi-State discriminates against him on the basis of his vision disability because Bi-State denies him equal access to public transportation systems and services by failing to: (1) design, implement, and maintain a website and mobile app that can be used independently by visually impaired individuals; (2) stop and transport Plaintiff and his guide dog on December 26, 2013, June 13, 2014, and August 5, 2014; (3) properly identify the location of bus stops and ticket sales

1

equipment at MetroLink stations; (4) discontinue use of inaudible fare boxes and ticket vending machines; (5) discontinue use of machinery requiring precise placement of paper bills and coins; (6) maintain audio equipment that clearly and consistently plays announcements on the MetroLink and MetroBus, including route identifications and stops; (7) issue fare cards that can be interpreted by visually impaired individuals; (8) properly train employees on how to effectively transport and communicate with visually impaired individuals; and (9) maintain and operate a customer complaint process that investigates, monitors, and addresses complaints by visually impaired individuals.

In its Motion to Exclude Testimony currently pending before the Court, Bi-State asks the Court to exclude all or part of the testimony proffered by David R. Rishel and Dr. Joel Telles on the basis their testimony is not reliable or relevant.

## II.   STANDARD

Rule 702 mandates a policy of liberal admissibility, and expert testimony is permitted if it will assist the trier of fact in understanding the evidence or to determine a fact in issue. FED. R. EVID. 702; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court's goal in assessing expert testimony is to ensure that "all scientific testimony is both reliable and relevant." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)). The reliability requirement means that "the party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid," while the relevance requirement demands "the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Id.* (internal quotations and citations omitted).

Rule 702's requirements notwithstanding, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. This is because the Rule "only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal citation omitted). As such, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Id.* at 1100-01.

## III. DISCUSSION

In its Motion, Bi-State asserts Rishel does not meet the reliability factors set forth in *Daubert*,[1] his testimony is not relevant to the issues in this matter, he seeks to improperly give legal opinions, and his opinions concern matters a lay person could determine.[2] If the Court does not exclude Rishel's testimony in its entirety, in the alternative, Bi-State argues portions of

---

[1] *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 590-93 (1993)
[2] Dr. Telles was designated as an expert witness because he assisted Rishel in the design of the survey and data analysis of the train announcements. Therefore, Bi-State asks the Court to exclude his testimony if it excludes Rishel's testimony in its entirety or just Rishel's testimony regarding train announcements.

3

Rishel's testimony must be excluded, including his survey of rail announcements, and his opinions on signs and wayfinding, Bi-State's website and mobile applications, and Bi-State's training and management. The Court will address each argument, but it first summarizes Rishel's report to put the arguments in context.

### A. Summary of Rishel's Report

Gustafson hired Delta Services Group, Inc., which includes Rishel and Dr. Telles, to review the accessibility of Bi-State's rail and bus system as they relate to passengers who are blind and low vision. Rishel conducted a randomized survey of 459 rail car announcements over three weeks in April 2019, did a review of bus stop signs and markings at bus transfer centers near rail stations, reviewed the system used by Bi-State to vend and validate tickets used on trains and busses, reviewed rail stations, and reviewed an assessment of Bi-State's website and smartphone application by a third-party company.

Rishel assessed the presence and quality of announcements on trains and examined whether announcements are made at all, if an announcement can be heard, if the volume is too soft to be clearly heard, if they are clear enough to be understood, and if the same conditions exist at the front and rear seating locations in the train car.

Initially, Rishel concludes that Bi-State's policies regarding train announcements are not adequate, because it does not require train operators to announce the line of the train, or its direction of travel, and it does not require announcements to be made at a certain time in the ride. In conducting his survey of train car announcements, Rishel focused only on the announcement of the station name and whether it was clear and audible because that is all Bi-State's policies require. He did not analyze whether the train operators clearly and audibly announced the line of the train or the direction of travel.

Rishel observed 459 audio announcements on trains. He found 329 were loud and clear, 88 were garbled, meaning the announcements could not be understood, 64 were inaudible, meaning the announcements could not be heard, and 14 trains did not make any announcements. Rishel made an additional 242 observations of announcements at stations. He found 195 announcements were loud and clear, 5 were garbled, 5 were inaudible, and 37 stations made no announcements. He found variations in what was announced, and when it was announced, by each train operator. Rishel concludes the variation in announcements, even for those loud and clear, creates a confusing situation. He also concludes train speaker system volume levels are not appropriately considering ambient noise, making them inadequate. Rishel states that the wide variation in the timing, content, and quality of announcements is a strong indication of gaps in policy training and oversight.

Next, Rishel observed and evaluated signs in and around rail stations and bus stops. Rishel commonly found signs with 1.25-inch characters mounted more than 70 inches above the ground in violation of ADA regulations, which require a minimum of a two-inch character. He also observed that Bi-State uses a variety of different ways to identify bus stops; some stops have traditional signs, while others have bollards with the name of the station on it. The height of the signs also varied, making them more difficult to locate. Some signs included route information on only one side of the sign, or no information about bus routes, while others included non-bus related information such as "no parking." Rishel concludes these variations create a confusing and difficult to navigate means of wayfinding to bus stops. Rishel also concludes that blind or low-vision passengers are likely to see these signs and navigate to them, only to realize they do not have information needed to ride the bus.

Next, Rishel examined the accessibility of train stations for passengers with visual impairments including checking the audio information button on ticket vending machines, looking at station signs, and examining detectable platform edge warnings. Rishel found ticket vending machines with inoperable audio, which he concludes creates a barrier to use of the system. Rishel also observed that each rail station has a sign explaining how to buy a ticket, the cost of various tickets, and how to validate and use the tickets. These signs do not contain posted Braille or raised characters and the audio information provided at the ticket vending machine is not as comprehensive. He found the ticket validating machines print on each ticket the time period for which it is valid, but they do not have an audio component. Rishel concludes this process lacks accessibility and usability for passengers who are blind or low-vision because these passengers have no means to obtain the essential information relating to the validation and expiration of their tickets.

Rishel also found that three stations did not have ticket vending machines near the entrance of the paid fare zone and instead had them inside the zone. He concludes passengers who are blind or low-vision would not be able to find a ticket machine using tactile clues, because the machine is not in a standard spot, creating a significant hinderance for a person with a visual impairment. Next, Rishel found that station identification signs in raised characters and in Braille, required to be near the entrances to stations, were sometimes missing or inaccessible, or included incorrect information.

Rishel states that every high-level platform is required to have a consistent means of warning visually-impaired passengers that they are approaching the edge of the platform. Rishel found that the detectable warnings had been installed at every station, were in generally good condition, generally ran the full length of each platform, and used typical yellow tiles as

detectable warnings. However, Rishel found seven stations used gray tiles that did not provide a clear contrast with the platform, creating a potentially hazardous situation.

Rishel also examined information concerning bus routes and schedules at bus interchange centers. At two stations, pending departure information was displayed on an LED sign and provided no wayfinding information. There was no accompany audio component to the signs. The only audio announcements were provided by the buses themselves. Some stations used bulletin boards, posted behind glass. Rishel concludes that it would be impossible for a visually-impaired passenger to navigate the system without access to this information.

Next, Rishel summarized the findings of Equal Entry's analysis of Bi-State's website and online information, which the Court does not reiterate here. Finally, Rishel addresses Bi-State's training and management. He states he did not have the opportunity to review the training and management practices, but he concludes several problems can only be attributed to training and management. In conclusion, Rishel provides the following assessment of Bi-State's bus and rail system:

> Overall, in our expert opinion, the cumulative effect of the deficiencies and ADA compliance violations documented in the report constitutes [sic] a barrier that would prevent, prohibit or significantly restrict the ability of a passenger who is blind or low-vision from using the St. Louis Metro transit system.

**B.     Reliability**

Bi-State argues Rishel's opinions are unreliable because his own industry does not accept his techniques, they have not been subjected to peer review or publication, they cannot and have never been tested, and they have no known rate of error.

*Daubert* provided a list of factors to consider when screening expert testimony for relevance and reliability: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the

7

known or potential rate of error; and (4) whether the theory has been generally accepted. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686-87 (8th Cir. 2001). The Supreme Court stated that a trial court may consider one or more of these factors when doing so will help determine the testimony's reliability, but the test of reliability is flexible and the list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The specific factors listed in *Daubert* do not apply to the type of expert report at issue here. Rishel does not provide scientific or technical knowledge that lends itself to testing, peer review, and rates of error. Instead, he provides a specialized knowledge where he applies his experience designing ADA-compliant transit systems to evaluate whether Bi-State's rail and bus system creates barriers to use for blind or low-vision passengers. Additionally, his technique can be tested – any expert in ADA compliance could ride the train and bus systems as Rishel did and observe and analyze whether the announcements were audible, the placement and readability of the signs, or any other part of the system analyzed by Rishel. His report includes a detailed description of his methodology and the processes he used to assess the system, and the information he relied on to write his report. Rule 702 is one of admissibility rather than exclusion; any issues Bi-State has concerning Rishel's reliability can be addressed on cross-examination. *Lauzon*, 270 F.3d at 686. The Court will not exclude Rishel's testimony on this basis.

### C. Relevance

Bi-State argues Rishel's testimony is not relevant to the issues in this matter. Specifically, Bi-State asserts Rishel's opinions do not advance Gustafson's argument he has been denied access to Bi-State's fixed route services nor does Rishel opine on any deficiencies in Bi-

8

State's paratransit services, which would provide Gustafson meaningful access to Bi-State's transportation system. Bi-State also claims Rishel's report does not attempt to link his findings to the factual allegations contained in the Fourth Amended Complaint and his testimony is not supported by any data and is too speculative to be admissible.

Rule 702 requires that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue to be admissible. Fed. R. Evid. 702. "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Daubert*, 509 U.S. at 591. Here, Rishel's testimony is relevant and will assist the trier of fact in determining the accessibility of Bi-State's transit services for visually-impaired passengers. While Rishel does not opine that Gustafson himself was denied access to Bi-State's fixed route services, he does opine on barriers to the system that anyone with a visual impairment may experience. This is relevant in that it supports Gustafson's claim he was denied access and will help a jury determine the credibility of Gustafson's testimony as to his personal experiences. Rishel's lack of opinions on Bi-State's paratransit services does not make the opinions he does assert irrelevant; an expert is not required to opine on every issue in the case.

Contrary to Bi-State's argument, Rishel's opinions clearly link to the factual allegations made in the Fourth Amended Complaint. Gustafson alleges he cannot locate the ticket sales equipment, identifying announcements on trains are inconsistently made, not amplified, and are difficult to understand, the platform edges do not provide clear visual contrast, and pertinent information printed on tickets cannot be confirmed by riders with visual disabilities. As summarized above, all of these are issues Rishel opines on in his report.

Finally, Rishel's opinions are not speculative, unsupported by sufficient facts or contrary to the facts of this case. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)

9

(finding that "expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."). In each opinion he specifically outlines his observations of the scene at each bus stop, rail station, or train car, and then connects his opinion to those facts. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Id*. That is simply not the case here.

For example, Rishel opines that gray tiles at a platform's edge found at a few stations represent "a potentially hazardous situation and is a barrier for passengers who are blind or low vision and who rely on a visually discernable platform edge marking." Doc. 80-1, pg. 65. He compares the contrast and visibility of the yellow platforms at the Lambert Airport Terminal #2 Station and Convention Center Station with the gray platform at the University City-Big Bend Station and Skinker Station. He does not simply state gray platforms create a barrier. Rishel's opinions are relevant to the issues in this matter, are not speculative or unsupported by sufficient facts, and they connect to the factual allegations in Gustafson's complaint. The Court will not exclude Rishel's testimony on this basis.

### D. Legal Opinions

Bi-State next argues the Court should exclude Rishel's testimony because he improperly seeks to give legal opinions. Bi-State asserts Rishel's report refers repeatedly to the U.S. Department of Transportation's ADA regulations and the application of these regulations to Bi-State's transportation system.

Expert testimony on legal matters is not admissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). "Matters of law are for the trial judge and it is the judge's job to instruct the jury on them." *Id.* Although expert witnesses may embrace an ultimate issue in their testimony, they may not state legal standards or draw legal conclusions by applying law to the facts. *Cowden v. BNSF Ry. Co.*, 980 F. Supp. 2d 1106, 1118 (E.D. Mo. 2013). Testimony about industry standards, or policies adopted by other institutions to comply with applicable regulations is not generally a legal opinion or conclusion. *Frye v. Hamilton Cty. Hosp.*, No. 18-CV-3031-CJW-MAR, 2019 WL 2404330 at *6 (N.D. Ia. Jun. 7, 2019) (citing *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018). An expert may also testify as to the history and purposes of a statute and industry practice or standards. *Portz*, 297 F. Supp. 3d at 953.

The Court will not permit Rishel to testify on Bi-State's compliance, or lack thereof, with any statutes or regulations. Any opinions on compliance are legal conclusions and are not admissible. However, the Court does not find that Rishel's report is so rife with references to the regulations, and application of those regulations, as to require his testimony to be excluded in its entirety.

**E.    Lay Opinions**

Next, Bi-State argues Rishel should be required to testify as a lay witness, not an expert witness. Bi-State asserts that after removing the legal conclusions from Mr. Rishel's report, the report consists of nothing but observations of noises, colors, and measurements. The Court disagrees.

While Rishel's report contains many observations, it also includes the application of his expertise and knowledge of accessibility of transit systems to Bi-State's transit system. He

11

describes the situation at a bus station, for example, and then explains the effect his would have on a visually-impaired passenger. While FRE 703 permits experts to rely on facts and data beyond what they have personally observed, it does not require them to do so. Fed. R. Evid. 703 (stating "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). Rishel's testimony includes more than just observations and his "specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. The Court will not exclude Rishel's testimony on this basis.

### F. Exclusion of Specific Opinions

Because the Court has not excluded Rishel's testimony in its entirety, Bi-State asks the Court to exclude certain portions of testimony, specifically his testimony on rail announcements, signs and wayfinding, website and mobile applications, and training and management.

#### i. Rail Announcements

Bi-State asserts Rishel's testimony on rail announcements should be excluded because he destroyed more than 100 audio recordings related to his survey of rail announcements and included only nine sample recordings in his report. Additionally, Bi-State argues his testimony is neither relevant nor helpful because he did not survey any individuals to ascertain whether they could hear and understand the announcements, nor did he ask Gustafson.

Bi-State mischaracterizes Rishel's deposition testimony when it states he deleted more than 100 audio recordings. Rishel testified that he only made audio recordings when he was trying to include examples in his report, "[a]nd if they came out poorly as I was trying to make them, I just deleted them." Doc. 80-2, pgs. 13-14.[3] He further testified:

---

[3] The specific deposition citation is 49:22-50:3.

> Because we initially considered using audio recordings as a data point, but for a number of reasons, considered it to be impractical, potentially inaccurate. So we did not do it.
>
> And it's the standard – I have done this kind of work for other transit systems, done evaluations. And to the best of my knowledge, no one makes recordings because recordings tend to not be reflective of what you actually hear when you're sitting in the seat. Especially, I was using and [sic] iPhone and iPhones have – they have the same technology used when you're on a speakerphone, which cuts down on the background noise. So it actually distorts the quality of the recording.
>
> And we also found problems, when I have done past experimentation, with juggling a notebook and a pen and trying to do a recording on a crowded train, you often miss them and considered the risk of trying to manage all of that and getting a recording you couldn't rely on anyway, just was not – was not a prudent approach.

Doc. 80-2, pg. 14.[4] Bi-State's arguments go to the weight of Rishel's testimony and can be addressed on cross-examination. The Court will not exclude this portion of his testimony.

    **ii.**    **Signs and Wayfinding**

Bi-State argues that issues concerning the visibility of bus stop signs and information on bus stop signs is not relevant because these issues do not affect Gustafson due to his blindness. In the Fourth Amended Complaint, Gustafson alleges "Defendant does not identify the location of its bus stops for individuals with visual disabilities. As a result, Plaintiff is not independently able to locate the bus stop for general information, wayfinding, and safety." Doc. 47, ¶ 30. Rishel's report relating to the visibility of bus stop signs and information on those signs relates to this allegation in Gustafson's Complaint and therefore, has relevance.

Bi-State also argues that Rishel's testimony on accessible bus stop markers is irrelevant because in his report he states they are not required by the ADA. Rishel's report states, "This item is not strictly required by the ADA, but it is an item that was listed as part of Metro's aids for passengers with visual impairments." Doc. 80-1, pg. 43. Rishel's report concerns not only

---

[4] The specific deposition citation is 51:21-52:20.

compliance with the ADA, but as stated previously, barriers to access for visually-impaired individuals. His testimony on this point provides support to Gustafson's argument Bi-State's transit system is not accessible for visually-impaired individuals. The Court will not exclude this portion of his testimony.

### iii. Website and Mobile Applications

Bi-State asserts the Court should exclude Rishel's testimony on Bi-State's website and mobile applications because he did not conduct an assessment of the website or mobile applications and it is not his area of expertise. While an expert may base his opinion, *in part*, on what a different expert believes, he cannot simply regurgitate another expert's conclusions. *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1033 (E.D. Mo. 2009). Rishel's report on Bi-State's website and mobile applications summarizes Equal Entry's report and then provides Rishel's commentary on Equal Entry's report. This is not an acceptable basis for expert testimony. The Court excludes Rishel's testimony on Bi-State's website and mobile applications.

### iv. Training and Management

Finally, Bi-State asks the Court to exclude Rishel's testimony on Bi-State's training and management. In his report, Rishel states "This assessment did not afford us the opportunity to review St. Louis Metro's training and management practices. . ." Doc. 80-1, pg. 69. He then opines that there are indications of inadequate training and management. Because Rishel admits he did not do an assessment of Bi-State's training and management, he then has no basis to offer an opinion on the subject. Therefore, his opinions are speculative and the Court must exclude them.

Accordingly,

**IT IS HEREBY ORDERED** that Bi-State Development Agency's Motion to Exclude Testimony of David R. Rishel and Dr. Joel Telles Pursuant to Daubert [79] is **GRANTED, in part,** and **DENIED, in part**.

So Ordered this 24th day of January, 2020.

*SLR.CR*

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**