**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT GUSTAFSON, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-cv-02074 SRC |
| | ) | |
| BI-STATE DEVELOPMENT | ) | |
| AGENCY OF THE MISSOURI- | ) | |
| ILLINOIS METROPOLITAN | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant(s). | ) | |

## Memorandum and Order

Plaintiff Scott Gustafson has used Bi-State's transportation services since 1997, and is visually impaired.  Gustafson's history with Bi-State includes many complaints, including a charge of discrimination, which resulted in an investigation by the Missouri Commission on Human Rights, and a settlement agreement that released a broad scope of claims.  Later, Gustafson filed this case, originally in state court and asserting only state-law claims; three years into the state-court litigation, Gustafson filed federal claims, resulting in removal to this Court. To stave off Bi-State's motion for judgment on the pleadings, Gustafson's counsel represented to this Court both that the applicable federal regulations do not provide a private right of action and that even if they did, he did not base any of his claims on the regulations.  To avoid summary judgment, Gustafson now bases most of his claims on the regulations.  The Court considers the motions for summary judgment of both Gustafson [120] and Bi-State [114] and grants Bi-State's Motion and denies Gustafson's Motion.

## I.      Background

Gustafson initially filed this lawsuit in the circuit court of the City of St. Louis in 2015, alleging violations of the Missouri Human Rights Act.  Three amended petitions later, Gustafson added claims under the Americans with Disabilities Act and the Rehabilitation Act, and Bi-State removed the matter to this Court.  In 2019, Gustafson amended his complaint for the fifth time, filing his Fourth Amended Complaint.  In response, Bi-State moved for judgment on the pleadings, which the Court ultimately denied, along with Gustafson's request to file yet another amended complaint.

Gustafson's Fourth Amended Complaint alleges two claims against Bi-State: denial of access to governmental services, programs, and activities in violation of Title II of the ADA, 42 U.S.C. §§ 12101, et seq. (Count I), and failure to provide accommodations and access to information in violation of Section 504 of the Rehab Act of 1973, 29 U.S.C. § 794 (Count II). Gustafason alleges Bi-State discriminates against him on the basis of his vision disability by failing to adhere to ADA regulations in its facilities and services including: (1) bus and train announcements, (2) fare collection equipment, (3) the website and mobile application, (4) training programs, (5) MetroLink platforms including entrance signs, placement of ticket vending machines, and platform edges, (6) the complaint process, (7) the paratransit service, and (8) bus stop signs.  Gustafson also alleges Bi-State discriminated against him on the basis of his disability when its bus drivers failed to pick him up from bus stops on three or four occasions over the course of 15 years.

Both Gustafson and Bi-State now seek summary judgment.  Resolution of the motions and Gustafson's claims requires the Court to consider, among others, issues regarding a private right of action under the ADA regulations, and whether a 2011 settlement agreement between

Bi-State and the Missouri Commission on Human Rights arising out of a complaint Gustafson made to the Commission bars Gustafson's present claims.

## II.      Standard

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). The non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails

to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

III.    **Undisputed facts**

A.    **Affidavits**

Before reciting the material facts in this case, the Court addresses Gustafson's four arguments that the Court should exclude Bi-State's affidavits filed in support of its statement of material facts.

First, Gustafson argues that the Court cannot rely on Bi-State's affidavits because Bi-State initially filed the unsigned versions. This argument lacks merit. When Bi-State filed its statement of material facts and exhibits, it accidentally filed unsigned affidavits. The same day, Bi-State realized its mistake and contacted the Court to have the correct, signed versions filed. With the Court's permission and assistance, Bi-State replaced the unsigned affidavits with signed ones and provided Gustafson with copies of the signed affidavits. See Doc. 115. Bi-State made a simple mistake that it quickly corrected. The Court can only hope that if Gustafson's counsel

ever find themselves in a similar situation, opposing counsel will kindly "do unto others as you would have them do unto you."  The Court will not exclude Bi-State's affidavits on this basis.

Second, Gustafson argues the affidavits are inadmissible because they are self-serving, rely on business records without a proper foundation and contain hearsay.  The affidavits do not rely impermissibly on business records lacking a proper foundation.  Bi-state's witnesses and their affidavits establish a proper foundation for business records under Federal Rule of Evidence 803(6) because they are qualified witnesses and the records were generated as a part of Bi-State's regular practices.  *See Moore v. CCB Credit Servs. Inc.*, No. 4:11CV2132 RWS, 2013 WL 211048 at *3 (E.D. Mo. Jan. 18, 2013) ("A foundation for the business record exception rule 'may be supplied by a custodian of records or other qualified witness who has no personal knowledge of the creation of the document . . . [and] may also be established by circumstantial evidence or by a combination of direct and circumstantial evidence.'") (quoting *United States v. Kail*, 804 F.2d 441, 448-49 (8th Cir. 1986)).  The affidavits do not contain hearsay because a witness may rely on reports, business records, and documents to form his or her personal knowledge.  *See Jackson v. Cavalry Portfolio Servs., LLC*, No. 4:13CV617 CEJ, 2014 WL 517490 at *2 (E.D. Mo. Feb. 7, 2014) (The Court found the witness's testimony to be based on his personal knowledge and not inadmissible hearsay even though it included a review of the plaintiff's account documents).  Finally, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial – it is whether it *could* be presented at trial in an admissible form."  *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (emphasis in original).  Bi-State could present the records and reports relied on in the affidavits in an admissible form at trial.

Third, Gustafson claims that some of the witnesses provide expert testimony but Bi-State did not disclose them as experts.  The affidavits used by Bi-State do not constitute expert testimony; the affidavits come from lay witnesses offering some opinion testimony.  "A lay witness' testimony in the form of opinions or inferences need only be rationally based on perception and helpful to a determination of a fact in issue."  *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004 (8th Cir. 1986).  "Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony."  *Id*. at 1004-05.  Applying this standard, the testimony provided in the affidavits constitutes admissible testimony.  Because they qualify as lay witnesses, Bi-State did not need to disclose these individuals as experts in its Rule 26 disclosures.  *See* Fed. R. Civ. P. 26(a)(2)(A) (requiring a party to designate a witness as an expert only if the witness will present evidence under Federal Rules of Evidence 702, 703, or 705).

Finally, Gustafson asserts Bi-State did not disclose Jim Schifferdecker, Phillip Mosely, Jr., and Mark Hasler as witnesses at all but used their affidavits to support its Motion.  Rule 26(a)(1)(A)(i) requires a party to disclose the name of any individual likely to have discoverable information.  When a party fails to comply with Rule 26(a), the party may not use the witness to provide evidence on a motion "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Bi-State's failure to disclose these witnesses is harmless because Gustafson does not dispute the underlying facts in their affidavits and other witnesses, who were disclosed, could have testified to the same facts.  The Court will not exclude Bi-State's affidavits.

### B.      Undisputed material facts

### i.      Background

In 1949, an interstate compact between Missouri and Illinois established Bi-State, a system that includes MetroLink (a light-rail system), MetroBus (a bus system), and Metro Call-A-Ride (a paratransit system).  Bi-State receives federal financial assistance from the United States Department of Transportation.  Bi-State operates 60 fixed-bus routes in Missouri and 18 fixed-bus routes in Illinois.  In 1993, Bi-State began operating MetroLink, which covers 38 miles.  MetroLink consists of two lines, features 37 stations, and carries an average of 67,684 people each weekday.  Any member of the general public can access Bi-State's services without going through an application process.

### ii.      Gustafson's use of Bi-State's services

Gustafson is a 60-year-old resident of St. Louis and has a progressive congenital disorder, retinitis pigmentosa, which causes his vision to progressively deteriorate over time.  At one time, he could read normal print, but he has been unable to use his own sight to independently read since approximately 1986.  He can presently perceive only light.  Gustafson has a guide dog, Jersey, who typically and routinely accompanies him when he travels and uses Bi-State's services.  When his guide dog is unwell or otherwise unavailable, Gustafson uses a white cane to travel.  Since 1997, MetroBus and MetroLink have been Gustafson's primary mode of transportation because he cannot drive a car or ride a bike.  In one month in 2019, Gustafson used MetroLink approximately 20 to 50 times.  Gustafson can independently board and disembark from MetroBus and MetroLink vehicles.

### iii.    Litigation history

In 2006, Gustafson filed a charge of discrimination with the Missouri Commission on Human Rights alleging Bi-State violated the Missouri Human Rights Act by denying him access to services in a place of public accommodation since Gustafson first used Bi-State's services.  In 2010, the Commission initiated administrative proceedings against Bi-State based on some of Gustafson's allegations in his 2006 charge and in 2011, Bi-State and the Commission executed a settlement agreement that resolved Gustafson's allegations and the Commission's administrative proceedings.  Gustafson did not sign the settlement agreement, but he did not challenge the resolution through judicial review or any other action.

Separate from the Commission's proceedings, in 2008, Gustafson filed a lawsuit alleging disability discrimination in St. Louis City's small claims court alleging Bi-State denied him access to MetroLink due to inaccessible ticket vending machines.  Then, in April 2014, Gustafson filed another charge of discrimination with the Commission alleging Bi-State's buses drove past him without picking him up because of his disability.  Gustafson amended his charge in November 2014.  The charge was not resolved and resulted in the filing of this lawsuit.

### iv.    Gustafson's claim of failure to transport/drive-bys

Gustafson believes buses have repeatedly driven past him when he has his guide dog, Jersey, with him.  On December 26, 2013, June 13, 2014, and August 5, 2014, Bi-State's bus drivers did not stop and transport Gustafson and Jersey.  Gustafson believes the buses did not pick him up because he had Jersey on each of these occasions and that it does not matter to the drivers that Jersey is a guide dog.  He has encountered bus drivers who openly show disdain for Jersey, and he believes bus drivers either do not like or fear dogs and would have no compunction driving past a blind person with a dog.  Gustafson testified he has had other

8

incidents of buses driving by him without stopping.  In March 2013, he called customer service

to complain of a drive-by at Lansdowne and Wabash.

**IV.     Discussion**

Both Gustafson's and Bi-State's Motions for Summary Judgment include numerous

arguments, but to resolve the motions, the Court need only address a few, including the issue of

private rights of action under the ADA's regulations, whether a prior settlement agreement bars

Gustafson's claims, whether Gustafson may assert a paratransit segregation claim, and finally,

whether a dispute of material fact exists to allow Gustafson's claim of drive-bys to survive

summary judgment.

**A.       Private right of action under the regulations**

In his Fourth Amended Complaint, Gustafson alleges Bi-State violated 42 U.S.C. §§

12148(a)(1), 12149, and various Department of Transportation regulations promulgated under

the ADA and found in 49 C.F.R. §§ 27, 37, 38.  Doc. 47, ¶ 82.  But when listing Bi-State's

specific unlawful practices, he cites solely to regulations and never to the statute.  Doc. 47, ¶ 84.

Similarly, in his Motion for Summary Judgment and in his response to Bi-State's Motion for

Summary Judgment, Gustafson asserts Bi-State violated various DOT regulations and relies

almost solely on the regulations to support his claims.  For only two claims, does he cite to the

statute – his paratransit segregation claim, raised for the first time at summary judgment, and his

claim regarding drive-bys.  Thus, while Gustafson purports to assert claims for violations of Title

II of the ADA, he actually asserts claims for violations of DOT's regulations promulgated

pursuant to Title II.  The question then arises of whether or not the regulations provide for a

private right of action.

This issue first arose at a hearing the Court held in November 2019 on various pending motions, including Gustafson's motion to amend the complaint and Bi-State's motion for judgment on the pleadings.  Doc. 112, pgs. 57-77.  At the hearing, Gustafson's counsel affirmed that the regulations do not provide a private right of action and that Gustafson uses the regulations solely as evidence of Bi-State's discriminatory intent.  *Id.* at 58, 77.  The Court specifically asked counsel, "You are saying the regs provide a private right of action?"  *Id*. at 58.  Counsel responded, "The regs do not provide a private right of action."  *Id*.

In reliance on Gustafson's counsel's statements at the hearing, the Court denied Bi-State's motion for judgment on the pleadings.  In its order, the Court stated, "Gustafson will not be permitted to raise at trial Bi-State's alleged failure to comply with federal regulations as claims pursuant to the ADA or the Rehab Act."  Doc. 113, pg. 8.  Gustafson cannot now assert that he has a private right of action under the regulations.  *Mayo v. UBS Real Estate Sec., Inc.*, No. 08-00568-CV-W-DGK, 2012 WL 2848002 at *3 (W.D. Mo. Jan. 13, 2012) ("A litigant that has previously been given a full and fair opportunity to argue an issue is not permitted to later make an argument that could have been, and should have been, raised earlier.").  As the *Mayo* court stated, "Allowing a party to raise a new argument months later, or in this case years later, after an issue has been litigated, encourages serial litigation and undermines the efficient administration of justice."  *Id*.

The doctrine of judicial estoppel also precludes Gustafson from resurrecting causes of action under the regulations.  Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).  As an equitable doctrine invoked at the court's

10

discretion, "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id*. at 750 (internal quotation omitted). A court may consider the following three factors, along with other factors not enumerated, when considering whether to apply the doctrine: (1) whether the party's current position is clearly inconsistent with its prior position; (2) whether the party had success in persuading a court to accept its prior position; and (3) whether the party's change in position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. at 750-51.

While the Eighth Circuit has stated the doctrine applies to different phases of the same case, the Court was unable to find a case in which the Eighth Circuit definitively applied it in such a situation. *See Hossaini v. Western Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir. 1998) ("The doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the *same* or related litigation." (emphasis added)); *see also Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 981-82 (8th Cir. 2009) (considering but ultimately not applying the doctrine where a party took inconsistent positions before the district and appellate courts.). Nevertheless, the Court finds the situation in this case to be ripe for application of the doctrine.

First, Gustafson's current position is inconsistent with his prior position. As detailed above, Gustafson's counsel clearly stated at oral argument on Bi-State's motion for judgment on the pleadings that Gustafson did not seek to enforce the regulations and that no private right of action existed to enforce the regulations. Now, he argues the exact opposite. Second, Gustafson succeeded in persuading the Court; the Court denied Bi-State's motion on the basis that Gustafson did not seek to pursue a cause of action under the regulations. Finally, Gustafson's change in position causes an unfair detriment to Bi-State, which relied on Gustafson's position

when crafting its summary judgment motion and responding to Gustafson's summary judgment motion.  Had Gustafson taken his current position in response to Bi-State's motion for judgment on the pleadings, the Court would have resolved the issue at that point, saving the parties and the Court from addressing the issue on summary judgment.  For these reasons, judicial estoppel prevents Gustafson from now asserting that a private right of action exists under the regulations.

Even if he were permitted to raise the issue, nonetheless, the Court finds the regulations do not create a private right of action.  In *Alexander v. Sandoval*, the Supreme Court outlined when a private right of action arises.  532 U.S. 275, 286-87 (2001).  Private rights of action must be created by Congress; thus, the judiciary must interpret a statute to determine whether it displays an intent to create a private right and remedy.  *Id*. at 286.  The search begins with the text and structure of the statute.  *Id*. at 288.  "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'"  *Id*. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).  Regulations may not create a private right of action that the statute itself did not create.  *Id*. at 291 ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.").

Following *Sandoval's* instruction, the Court turns to the language of the statute.  Title II creates a private right of action against noncompliant public entities.  *See* 42 U.S.C. § 12133; *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  In Title II, Congress expressly provided for the Attorney General and the Secretary of Transportation to create regulations necessary to carry out the statute.  *See* 42 U.S.C. §§ 12134, 12143, 12149, 12164.  The purpose of these regulations is to provide standards for complying with Title II.  *Id*.  But nowhere in these sections of the

12

statute, or in the enforcement provision, § 12133, did Congress express an intent to create a private right of action and a remedy under the regulations.

Section 12133 states specifically, "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." The statute does not state that the remedies, procedures, and rights extend to violations of the *regulations*. *Id*. Contrast Title II with the Telephone Consumer Protection Act, which contains specific language allowing for private enforcement of the statute and the regulations. *See* 47 U.S.C. § 227(b)(3). The TCPA authorizes a person or entity to bring an action "based on a violation of this subsection *or the regulations* prescribed under this subsection to enjoin such violation." *Id*. (emphasis added). Congress could have provided similar language in Title II, but it did not.

Title II provides no general, or specific, authorization for private enforcement of its regulations. Because no general authorization exists in the statutory text, the Court's inquiry ends and it does not turn to each individual regulation to determine if it is privately enforceable. *See Sandoval*, 532 U.S. at 291 ("[W]hen a statue has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable.").

The Eighth Circuit has not weighed in on the issue of whether Title II's statutory text supports any private right of action under any regulation, or on whether the particular regulations at issue here may be enforced by private action. Absent this specific guidance, the Court notes that various circuit courts have addressed private enforcement of certain regulations under Title II. *See Lonberg v. City of Riverside*, 571 F.3d 846 (9th Cir. 2009); *Iverson v. City of Boston*, 452

13

F.3d 94 (1st Cir. 2006); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004). In view of the Court's rulings that Gustafson cannot now raise the regulations as providing a cause of action and that the statutory text does not authorize private rights of action under the regulations, the Court does not address Gustafson's arguments that specific regulations provide causes of action.

All of Gustafson's claims, besides two, rely on a private right of action under the regulations. The Court grants summary judgment to Bi-State on those claims, dismisses those claims, and now turns to Gustafson's remaining two claims – his paratransit-segregation claim and his drive-by claim.

## B. Gustafson's paratransit-segregation claim

Gustafson asserts that Bi-State failed to submit, implement, and adhere to a lawful paratransit plan approved by the Secretary of Transportation in violation of 42 U.S.C. § 12143. Gustafson raises this claim for the first time in his Motion for Summary Judgment. A party cannot raise a new claim at the summary judgment stage. *WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004)); *see also Sasser v. Ark. Highway & Transp. Dep't*, No. 5:96-CV-00466-WRW, 2007 WL 4365503 at *1 (E.D. Ark. Dec. 10, 2007) (citing cases from the 8th, 7th and 11th Circuits). At the summary judgment stage, the proper procedure for a plaintiff asserting a new claim is to seek to amend the complaint in accordance with FRCP 15(a). *Sasser*, 2007 WL 4365503 at *1. Because Gustafson did not seek to amend his complaint to add this new claim, the Court will not consider the claim.

C.      **Gustafson's drive-by claim**

Gustafson alleges MetroBus drivers drove past him on three occasions in 2013 and 2014 when he stood in the bus stop area and his guide dog accompanied him.  He asserts this claim under 42 U.S.C. § 12132.  Bi-State asserts a 2011 settlement agreement bars all of Gustafson's claims, including his claim related to drive-bys.

i.      **The 2011 settlement agreement**

Bi-State asserts that a 2011 Settlement Agreement between the Missouri Commission on Human Rights and Bi-State bars all or part of Gustafson's claims.  In 2006, Gustafson filed a charge of discrimination with the Commission against Bi-State.  As a result of Gustafson's complaint, the Commission filed a petition against Bi-State and eventually the Commission and Bi-State entered into a settlement agreement.  As stated in that agreement, Gustafson objected to the terms of the settlement and refused to participate in it.  He did not intervene in the action and the Commission and Bi-State decided to enter into the agreement without Gustafson.

The agreement stated, "The parties to this Agreement desire to compromise, resolve, and settle all issues and disputes between them, including those raised in the administrative complaint and the First Amended Petition or which could have been raised therein, on the following terms and conditions."  Doc. 115-11, pg. 2.  The agreement further stated,

> For the valuable consideration referenced above, the sufficiency of which is hereby acknowledged, the MCHR, . . .  does hereby waive and release and forever discharge Metro, . . .  from any and all charges, claims, suits, demands, damages, debts, liens, liabilities, costs, expenses, actions, and causes of action, of every kind and nature, whether known or unknown, suspected or unsuspected, that Complainant had, now has, or which he may have against the Metro Released Parties arising out of, related to or based upon any fact(s) or event(s) which occurred on or prior to the date of this Agreement, including, but not limited to, any charge, claim, suit, or action arising under or relating to any and all federal, state, and local laws, statutes, ordinances, or regulations relating to the full and equal use and enjoyment of places of public accommodation, including, without limitation,

15

the MHRA, § 213.065 et seq. and the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

Doc. 115-11, pg. 5.

"Missouri law provides that a settlement agreement must be construed using ordinary rules of contract construction." *Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 552 (8th Cir. 2017). "The primary rule is that the intention of the parties shall govern." *Kansas City, Mo. v. Colbert*, 978 S.W.2d 421, 423 (Mo. Ct. App. 1998). "The scope of the settlement is determined by the intent of the parties, ascertained from the language used and from the circumstances surrounding the settlement." *Id*.

Gustafson argues that the agreement does not apply to him because he did not sign it. Missouri law states otherwise. From the time a complainant files a charge, the Commission is required by statute to engage in settlement or conciliation with respect to the complaint. Mo. Rev. Stat. § 213.077.1. The statute states that "[a]ny settlement and conciliation agreement negotiated during such period shall be an agreement between the complainant and respondent and shall be subject to approval by the executive director [of the Commission]." *Id*. Thus, even though the Commission negotiates the settlement, it is on behalf of the complainant and the agreement binds the complainant. Thus, the agreement at issue in this case is enforceable against Gustafson.

Gustafson argues this goes against public policy, but the MHRA protects a complainant's rights by creating several different ways a complainant can challenge the Commission's handling of the complaint. Complainants can intervene in an action before the Commission and appeal any order of the Commission. Mo. Rev. Stat. §§ 213.075.7, 213.075.16. A complainant may also elect to have the claims asserted in the complaint decided in a court of law rather than a hearing before the Commission and can intervene in the suit that is filed. Mo. Rev. Stat. §§

16

213.076.1, 213.076.3.  Finally, if there is a settlement agreement, and a party breaches the agreement, the parties, including the complainant, may personally file a suit to enforce the agreement.  Mo. Rev. Stat. § 213.085.

All of these provisions, along with others not mentioned, serve to protect the rights of the complainant while at the same time fulfill the purpose of the Commission to resolve complaints in an informal manner and to "encourage fair treatment for and to foster mutual understanding and respect among, and to discourage discrimination against . . . persons with disabilities."  Mo. Rev. Stat. § 213.020.  Enforcement of the settlement agreement does not violate public policy but instead, as determined by the legislature, promotes it.

Because the settlement agreement applies to Gustafson, the Court now determines what specific claims the settlement agreement covers.  The settlement agreement bars any claims that relate to the terms of the agreement; thus, Gustafson must bring any claims related to the terms of the agreement as an action asserting breach of a settlement agreement under contract law, essentially a breach of contract action.  *Brewer v. Cosgrove*, 498 S.W.3d 837, 843 (Mo. Ct. App. 2016) ("A settlement agreement is governed by contract law."); *see also Residential & Resort Assocs., Inc. v. Wolfe*, 274 S.W.3d 566, 569 (Mo. Ct. App. 2009) (Where no litigation is pending, a party must file an action for breach of a settlement agreement to enforce the terms of the settlement agreement).  In the settlement agreement at issue here, Bi-State agreed to the following terms: (1) to make a charitable contribution to the Missouri Council for the Blind; (2) to implement an Automatic Vehicle Locator System and automated announcement system on the entire bus fleet; (3) to implement a "Smart Card" system for fare collection that includes ticket validation machines with auditory cues for visually impaired passengers; (4) to install "rumble strips" at all platform entry points that designate the location of ticket vending and validation

machines; (5)  to emboss ticket vending machines with Braille instructions accompanied by audio instructions; (6) to continue its policy that bus drivers stop at all bus stops to board waiting passengers; (7) to keep its website content in a "text based format" generally accessible to most screen reader products; (8) to continue to work with members of the Metro Access Advisory Group; and (9) to install bus stop signs and information plates that have both Braille and raised letters.

Number six of the settlement agreement covers Gustafson's claim regarding drive-bys. The exact language of this section states, "It is and will continue to be Metro's policy that bus operators must stop at all bus stops to board waiting passengers.  Operators face disciplinary action in cases where it is proven that passengers were by-passed."  Doc. 115-11, pg. 4.  Because the settlement agreement bars this claim, the Court grants summary judgment to Bi-State and dismisses the claim.

### ii.      Merits of the claim

Even if the settlement agreement did not cover this claim, the Court would still grant summary judgment in Bi-State's favor.  In support of this claim, Gustafson supplied the Court with evidence of his own experiences but also numerous complaints detailing additional instances where MetroBus drivers failed to pick up visually-impaired individuals.  The content of the complaints constitute hearsay so the Court cannot consider them.  Fed. R. Evid. 802, 801(c).

Without evidence from other passengers, the Court is left with evidence of only Gustafson's experiences.  Three or four instances of discrimination over the many years Gustafson has used MetroBus does not constitute discrimination by Bi-State.  Having used Bi-State's services since 1997, Gustafson has presumably ridden MetroBus hundreds of times over the years, and only had this occur, at most, a handful of times.  In *Midgett v. Tri-County*

*Metropolitan Transportation District of Oregon*, the plaintiff alleged he experienced problems

with bus wheelchair lifts on four occasions.  254 F.3d 846, 848 (9th Cir. 2001).  He also

produced evidence of other passengers who experienced issues 30 to 40 times over a two-year

period.  *Id.*  The Ninth Circuit held that this evidence established "frustrating, but isolated,

instances" and that "these occasional problems do not, without more, establish a violation of the

ADA."  *Id.* at 850.  Similarly, Gustafson's occasional problems with MetroBus do not establish a

violation of the ADA.  The Court grants summary judgment to Bi-State and dismisses the claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [114] is

**GRANTED**.  The Court dismisses all of Gustafson's claims with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [120] is

**DENIED**.

So Ordered this 27th day of August, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**